**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DANIEL J. CUTIE, and CUTIE**
**PHARMA-CARE, INC.**

                              **Plaintiffs,**

    **vs.**                                     **1:11-cv-66**
                                                **(MAD/RFT)**

**JAMES G. SHEEHAN, former New York**
**State Medicaid Inspector General, in his**
**individual; ANGELO J. RUPERTO, in his**
**individual and official capacities; MARTIN**
**MCMAHON, in his individual and official**
**capacities; JOHN AND JANE DOES #1-20;**
**and JAMES C. COX, Acting New York State**
**Medicaid Inspector General, in his official**
**capacity,**

                              **Defendants.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**HISCOCK & BARCLAY**            **DAVID M. COST, ESQ.**
80 State Street                    **LINDA J. CLARK, ESQ.**
Albany, New York 122071
Attorneys for Plaintiffs

**OFFICE OF THE NEW YORK**       **C. HARRIS DAGUE, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorneys for Defendants
James G. Sheehan, Angelo J. Ruperto,
James C. Cox

**O'CONNOR, O'CONNOR, BRESEE**    **DENNIS A. FIRST, ESQ.**
**& FIRST, PC**                   **MARGARET E. DUNHAM, ESQ.**
20 Corporate Woods Boulevard
Albany, New York 12211
Attorneys for Defendant
Martin McMahon

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On January 18, 2011, Plaintiffs commenced the present civil rights action pursuant to 42 U.S.C. § 1983. In their first amended complaint, Plaintiffs allege violations of their Due Process and Equal Protection Rights, "Stigma Plus" defamation, and various state law claims sounding in common law defamation, slander, liable *per se*, tortuous interference with contracts/business relations, and *prima facie* tort. *See* Dkt. No. 22.

Currently before the Court are Defendants' motions for summary judgment. *See* Dkt. Nos. 47 & 49.

## II. BACKGROUND[1]

The New York State Department of Health ("DOH") is the single state agency responsible for supervising the administration of the Medical Assistance ("Medicaid") program in New York State. *See* Dkt. No. 47-1 at ¶ 1 (citing N.Y. Social Service Law ("SSL") § 363-a).[2] The Office of

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

[2] In their response to Defendants' statement of material facts, Plaintiff assert that paragraphs 1-9, 12, 16-17, 48, 51-52 and 67 of Defendants Cox, Sheehan and Ruperto's statement of material facts are improper in that they fail to set forth a specific citation to evidence in the record and because they contain legal arguments not properly included in a statement of material facts. *See* Dkt. No. 56-2 at ¶ 1. Further, Plaintiffs assert that, "[e]ven if it could be considered a 'fact', Plaintiffs deny that this is a fact that is material to this motion." *See id.*

Although Plaintiffs are correct that generally legal conclusions should not be included in a statement of material facts, the argument is misplaced here. Defendants have included these facts to provide background information regarding the roles of the underlying state agencies as they relate to the facts of this case. Moreover, although Defendants have provided citations to the New York State Social Services Law and Public Health Law, the statutes cited simply provide support for Defendants' explanations regarding the separate roles of the Department of Health and

(continued...)

the Medicaid Inspector General ("OMIG") is an independent office within DOH that is responsible for the prevention, detection, and investigation of fraud and abuse in the Medicaid program and for sanctioning any person who commits unacceptable practices. *See id.* at ¶ 2 (citing N.Y. Public Health Law §§ 30 *et seq.*). Under State law, the DOH and the OMIG are separate agencies with separate reporting responsibilities to the governor. *See id.* at ¶ 3. The OMIG's efforts are directed at preserving the integrity of the Medicaid program and ensuring provider compliance with applicable laws, regulations, rules and policies of the Medicaid program, as set forth in the New York Public Health Law, the New York Social Services Law, the regulations of the DOH, and the Department's Medicaid Provider Manuals and Medicaid Update publications. *See id.* at ¶ 5.

In advance of its mandate, OMIG possesses regulatory authority to sanction providers determined to be abusing the Medicaid program. *See id.* at ¶ 5. In this context, abuse can include, among other things, fraud and professional misconduct. *See id.* at ¶ 6. Sanctions available to OMIG include censure, reprimand, conditional or limited participation and exclusion from the Medicaid program. *See id.* at ¶ 7. An excluded provider is unable to bill Medicaid services during the pendency of its exclusion. *See id.* at ¶ 8.

Plaintiff Daniel Cutie is a licensed pharmacist in New York and co-owner of Plaintiff Cutie Pharma-Care, Inc. ("Pharma-Care"). *See id.* at ¶ 22. Plaintiff Pharma-Care is a Medicaid provider pharmacy located in Greenwich, New York. *See id.* at ¶ 10. Pharma-Care is a closed

---

[2](...continued)
Office of the Medicaid Inspector General. Finally, some of the statements are supported by affidavits of those with personal knowledge of the various roles of the different state agencies. *See, e.g.*, Dkt. No. 47-1 at ¶ 3 (citing Declaration of James G. Sheehan sworn to September 13, 2013 ("Sheehan Decl.") ¶ 4).

door, long term care provider pharmacy.  *See id.* at ¶ 11.  In this context, "closed door" means that the pharmacy does not service walk-in customers, and only services specific facilities.  *See id.* at ¶ 12.  Although Pharma-Care services individuals, it primarily services "long term care providers," such as assisted living facilities, enriched living or group home residents, and facilities that are under the regulations of the Department of Social Services, children's homes, Office of People With Developmental Disabilities ("OPWDD") facilities, rehabilitation centers under the auspice of the Office of Alcohol and Substance Abuse Services ("OASAS"), and home health care individuals.  *See* Dkt. No. 56-2 at ¶ 12.

During the relevant time period, 2005-2010, the majority of Pharma-Care's customers resided at Adult Care Facilities ("ACFs") and OPWDD facilities.  *See id.* at ¶ 13.  An OPWDD facility is generally a State run group home populated by individuals with developmental disabilities.  *See id.* at ¶ 14.  An ACF is an assisted living facility servicing individuals that require assistance in daily living due to age, condition or disability.  *See* Dkt. No. 47-1 at ¶ 14. ACFs differ from nursing homes insofar as nursing homes require nursing care 24-hours a day and have more restrictions and guidelines regarding monitoring, while ACFs have less institutional controls, including less nursing presence.  *See id.* at ¶ 15.

Plaintiff Pharma-Care utilizes a prescription dispensing mechanism called the Medicine-on-Time system.  *See id.* at ¶ 18.  The system is a multi-dose, commingled packaging system where medicines that are given at certain times of day are packaged together in individual cells and placed together in monthly trays, such that the individual taking the medication or the aide, or nurse administering the medication can break out the cell containing all of the medications the person requires at the particular time of day needed.  *See id.* at ¶ 19.  The Medicine-on-Time frames are packaged by Pharma-Care's pharmacists or pharmacy technicians at the pharmacy and

delivered to the facilities. *See id.* at ¶ 20. Before the frames are delivered to the customers, a pharmacist checks each cell to ensure that the medications are correct. *See* Dkt. No. 56-2 at ¶ 20.

As a licensed pharmacy and pharmacist within the State of New York, Plaintiffs are subject to the jurisdiction of the New York State Department of Education ("SED"). *See* Dkt. No. 47-1 at ¶ 23. Pursuant to this jurisdiction, the SED maintains authority to conduct investigations of its pharmacy licensees for professional misconduct. *See id.* at ¶ 24. SED maintains statutory and regulatory power to discipline its professional licensees for any activity deemed "unprofessional conduct." *Id.* at ¶ 25.

On June 14, 2006, SED conducted a pharmacy inspection of Pharma-Care in Greenwich, New York. *See id.* at ¶ 26.[3] According to Plaintiffs, the SED inspection was the result of a complaint filed by Pharma-Care's competitor, Omnicare, concerning their use of the multi-dose system. *See* Dkt. No. 56-2 at ¶ 27. The initial on-site visit was conducted by SED Senior Investigators Steve Grogan and David Smith. *See* Dkt. No. 47-1 at ¶ 28.

During the on-site inspection, Defendants contend that the investigators discovered activities which they deemed to constitute unprofessional conduct. *See id.* at ¶ 29. The alleged misconduct was set forth in the Final Investigative Report issued by Senior Investigator Grogan. *See id.* at ¶ 30. The Final Investigation Report alleged the following violations against Pharma-

---

[3] The Court notes that Plaintiffs object to this statement "as the Final Investigative Report is neither objective, reliable, nor accurate, and amounts to nothing more than . . . an opinion of a non-party witness. For this reason, the Final Investigative Report should be disregarded in its entirety by the Court." Dkt. No. 56-2 at ¶ 26. Plaintiffs object in this manner to any mention of the investigation or the Final Investigation Report that was generated.

The Court finds that Plaintiffs' objections are entirely without merit. The SED investigation and Final Investigation Report that was generated as a result of the investigation are unquestionably material to their civil rights action.

Care, Daniel Cutie and Wayne Thygesen, a pharmacist at Pharma-Care:

A) Placing in stock any pharmacy any part of a Rx compounded or dispensed drug which is returned by a patient in violation of 29.7(a)(14), evidenced by receiving patient's medication from their accounts, repackaging them and maintaining the balance of the script among the stock of the registered pharmacy.

B) Outdated/misbranded/adulterated drugs maintained in stock in violation of 29.7(a)(16)(17); 6811(9)(11)(12) as evidenced by rx vials and bottles found to contain drug tablets that had been cut in half that lacked any type of identification, manufacture[rs'] lot number and expiration date as required while being maintained in the drug stock.

C) Adulterating drugs in stock in violation of 29.7(a)(16); 6811(10); 6815(1), as evidenced by rx vials found at work stations and filling area, that contained medications that had been cut in half or smaller by staff employees.

D) Sale of a misbranded/adulterated or outdated drug in violation of 29.7(a)(16)(17); 6811(9)(11)(12) based on admissions during taped interviews that employees would rummage through bins containing adulterated/misbranded drugs as documented in item A, to fill patients orders on occasion from medications contained in the 6-plastic bins found on a work counter in the registered pharmacy.

E) Rx's for controlled substances filled/refilled in excess of legal quantities in violation of 6509(2); 80.70; 80.71; 80.72, as evidenced by controlled faxed prescriptions found during the inspection that had been filled over the 5 day allowed limit and the admission by pharmacists Cutie and Thygesen that faxed controlled scripts were filled at their face value when received.

F) Oral prescriptions (controlled substances) procedures do not comply with regulations of the Education Department and PHL in violation of 29.7(a)(2); 80.68; 80.70; 80.73(g) as evidenced by controlled phone-ins and faxed controlled scripts that lacked the required hard cover attached to the oral order and the required information documented on the scripts. This based upon violations noted at the time of inspection and oral admissions by the pharmacists that the required procedures were not being followed.

G) Dispensing pursuant to an invalid Rx in violation of 29.7(a)(1); 6810(1); PHL 80.67; 80.69; 80.70; 80.74 as evidenced at time of

> inspection physician orders being filled in lieu of a required
> prescription and faxed memos from facilities indicating new orders
> on a patient that were filled without an official prescription being
> received. Oral admissions by both pharmacists acknowledged this
> was a common practice and samples taken to show violations.

Dkt. No. 47-13 at 16-17. The investigators confiscated the drugs they deemed to be misbranded

or adulterated. *See* Dkt. No. 47-1 at ¶ 32. During an interview with Senior Investigator Grogan,

Wayne Thygesen admitted that when they were "in a pinch" because they had run out of a drug,

they would use the drugs returned from other patients to fill at least one day of the prescription so

that they could reorder the drug and fill the remainder of the prescription. *See* Dkt. No. 47-14 at

3-5.

Following the conclusion of their investigation, disciplinary recommendations were made

and the matter was referred to the prosecutions unit for review and determination of disciplinary

measures. *See* Dkt. No. 47-1 at ¶ 37. The SED prosecutions unit thereafter engaged in settlement

discussions with Plaintiffs and their then counsel regarding the charged violations over the next

few years. *See id.* at ¶ 38. In furtherance thereof, a draft Consent Order was proposed which

would have been in full satisfaction of the professional misconduct. *See id.* at ¶ 39. As part of

the draft Consent Order, Plaintiffs would have pled guilty to, among others, the following charge:

"Pharmacists received returned drugs from the facility accounts (such as adult homes), and

repackaged and/or dispensed the drugs, and/or maintained the balance of the prescriptions among

the pharmacy stock, in violation of 8 NYCRR section 29.7(a)(14)." *Id.* at ¶ 40; *see also* Dkt. No.

47-15 at 4-5.

Prior to finalization or execution, the draft Consent Order was sent by Plaintiffs' then

counsel to OMIG for review seeking an advisory opinion as to whether OMIG would take any of

its own disciplinary measures if the draft Consent Order was executed. *See id.* at ¶ 41.

Specifically, Plaintiffs' counsel asked OMIG whether the pharmacy would be excluded from the

Medicaid program if they entered in to the draft Consent Order. *See id.* at ¶ 42; *see also* Dkt. No.

47-6 at 1. In response, Deputy Medicaid Inspector General Michael Little stated that "the

specification of misconduct that has been charged . . . . are of such significant concern to the

OMIG that an administrative investigation would be initiated and an exclusion by our office is the

probable outcome." *Id.* at ¶ 43; *see also* Dkt. No. 47-6 at 9.

On May 28, 2009, a revised final Consent Order was executed between SED's State Board

of Pharmacy and Plaintiffs. *See id.* at ¶ 44. The final Consent Order was ultimately approved by

the SED Board of Regents on or around November 17, 2009. *See id.* at ¶ 45. Although the final

Consent Order charged Plaintiffs with eight separate counts of misconduct, Plaintiffs only

admitted guilt to three of the charges in order to resolve the matter. *See* Dkt. No. 56-2 at ¶ 46.

Specifically, Plaintiffs admitted guilt to the following:

> Pharmacists received returned drugs from the facility accounts
> (such as adult homes) and/or maintained the balance of the
> prescriptions among the pharmacy stock, in violation of 8 NYCRR
> section 29.7(a)(14).
>
> * * * * *
>
> Pharmacists dispensed oral prescriptions for controlled substances
> that lacked required information documented on the oral
> prescriptions and/or lacked the required hard cover prescription
> attached to the oral prescription or order, in violation of 8 NYCRR
> section 29.7(a)(2) by failing to comply with 10 NYCRR section
> 80.68 and/or 80.70 and/or 80.73(g).
>
> Pharmacists dispensed drugs without valid prescriptions, in that
> physician orders and/or faxed memos were used instead of required
> official prescriptions, in violation of 8 NYCRR section 29.7(a)(1)
> by failing to comply with 10 NYCRR section 80.67 and/or 80.68
> and/or 80.69 and/or 80.70 and/or 80.74.

Dkt. No. 47-16 at 3, 5-7. Regarding the first charge to which Plaintiffs admitted guilt, the

regulation at issue provides that "[u]nprofessional conduct in the practice of pharmacy shall include . . . [p]lacing in stock of any pharmacy any part of any prescription compounded or dispensed which is returned by a patient[.]" 8 N.Y.C.R.R. § 29.7(a)(14).[4]  Additionally, by virtue of the final Consent Order, Plaintiffs agreed to the following penalties: (1) Registration to operate a pharmacy in the State of New York subject to a Censure and Reprimand; (2) Placement on probation for a period of two (2) years; and (3) A fine of ten thousand dollars ($10,000).  *See* Dkt. No. 47-1 at ¶ 50.

Following approval of the final Consent Order by the Board of Regents, the disciplinary resolution was placed on the SED's public website in the Office of the Professions, Professional Misconduct Enforcement, Summaries of Regents Actions on Professional Misconduct and Discipline section.  *See id.* at ¶ 51; *see also* www.op.nysed.gov/opd/nov09.htm#cuti2 (last visited September 18, 2014).  The entries read as follows:

> Cutie Pharma-Care, Inc., 114 Main Street, Greenwich, NY
> Profession: Pharmacy; Reg. No. 025438; Cal. No. 24134
> Regents Action Date: November 17, 2009
> Action: Application for consent order granted; Penalty agreed upon:
> Censure and Reprimand, 2 years probation, $10,000 fine.
> Summary: Registrant admitted to the charge of violating pharmacy
> laws and regulations.
>
> Daniel J. Cutie, Greenwich, NY
> Profession: Pharmacist; Lic. No. 039311; Cal. No. 24133
> Regents Action Date: November 17, 2009
> Action: Application for consent order granted; Penalty agreed upon:

---

[4] In their response to Defendants' statement of material facts, Plaintiff Daniel Cutie claims that he was unaware that he was admitting "guilt" to the charges and claims that he was simply "trying to resolve the matter with SED to stay in business."  Dkt. No. 56-2 at ¶ 47.  Although "he admits to signing the document, he does not admit criminal 'guilt' to the charge set forth in paragraph #47.  This is because he understood that the term 'pharmacy stock' encompassed the entire pharmacy, not his definition of stock, which is what he would have dispensed from."  *Id.* (citations omitted).

> Censure and Reprimand, 2 years probation, $5,000 fine.
> Summary: Licensee admitted to the charge of violating pharmacy
> laws and regulations.

*Id.*

The OMIG Administrative Remedies Unit ("ARU") is the unit within the agency that handles recommendations of disciplinary sanctions for providers committing misconduct and/or fraud. *See id.* at ¶ 53. One of the methods the ARU uses to identify providers who may have engaged in misconduct warranting OMIG disciplinary action is to review SED's public website for reports of professional misconduct. *See id.* at ¶ 54. In November of 2009, the ARU became aware of Plaintiffs' admitted violations of pharmacy laws and regulations and their disciplinary censure by SED. *See id.* at ¶ 55.

As per agency practice, upon learning of potential violations, fraud or abuse of Medicaid, the ARU initiated an inquiry and referred the matter to the specific unit within OMIG that handled pharmacies and pharmacists. *See id.* at ¶ 56. Accordingly, the matter was referred to Defendant Angelo Ruperto, OMIG's pharmacist supervisor. *See id.* at ¶ 57. As one of the agencies lead investigators of pharmacies, Defendant Ruperto was asked to provide an opinion based on his professional knowledge, his background as a licensed pharmacist, and his own findings, as to the severity and/or degree of the professional misconduct committed by Plaintiffs. *See id.* at ¶ 58.[5]

---

[5] Plaintiffs deny this statement and assert that a genuine issue of fact exists. *See* Dkt. No. 56-2 at ¶ 58. Plaintiffs claim that, "[b]ased on Ruperto's expressed disapproval of Cutie's system, he targeted them for an exclusion and brought it to the attention of his colleagues at OMIG as evidenced by the email communications." *Id.* Plaintiffs cite to the deposition of Marilyn Goulty in which she stated that somewhere between 2004 and 2005 she had a conversation with Defendant Ruperto in which he stated that "he was aware of Cutie Pharma-Care and instructed me that our type of system couldn't be used and that we needed to stop using it." Dkt. No. 54-2 at 40-
(continued...)

At some point following the request from ARU for his opinion regarding the nature and severity of Plaintiffs' admitted violations of pharmacy laws and regulations, Defendant Ruperto contacted the lead investigator of SED's investigation of Pharma-Care, Steve Grogan. *See id.* at ¶ 61; *see also* Dkt. No. 56-2 at ¶ 62. Investigator Grogan eventually provided Defendant Ruperto with a copy of the investigation report. *See id.* at ¶ 63. Defendant Ruperto also obtained a copy of the final Consent Order, detailing the allegations and charges of professional misconduct to which Plaintiffs pled guilty, and SED's subsequently imposed sanction. *See* Dkt. No. 47-1 at ¶ 64. Defendant Ruperto contends that, based upon his review and knowledge of the violations to which Plaintiffs pled guilty, his discussions with SED investigator Grogan, his review of the SED investigative materials, his own knowledge of the pertinent regulations and his experience as a pharmacy investigator, he determined that the violations of law and professional misconduct admitted were "severe in nature." Dkt. No. 47-1 at ¶ 65. Plaintiffs, however, contend that Defendant Ruperto's motivation for his actions was his "dislike for Cutie and its medication distribution system." Dkt. No. 56-2 at ¶ 65. Plaintiffs assert that, up to and including 2007, there

_____

[5](...continued)

41. Plaintiffs further contend that "evidence establishes that he was not only going to provide an opinion on the alleged severity of Cutie's conduct, but also make [a] recommendation on whether Cutie should be excluded, as Sheehan testified he had the authority to do so." Dkt. No. 56-2 at ¶ 58 (citations omitted). Finally, Plaintiffs contend that Defendant Ruperto admitted that the decision to exclude was based off a myriad of opinions, including his own." *Id.* (citations omitted).

Again, the Court fails to see how any of Plaintiffs' arguments or citations to the record refute Defendants' statement or create an issue of fact. Defendants asserted that, as an ARU investigator, Defendant Ruperto was asked to investigate this matter and provide an opinion regarding the severity and degree of professional misconduct. The fact that Defendant Ruperto was aware of Pharma-Care in 2004 or 2005 is immaterial, as is the fact that he solicited the opinions and advice of others. If anything, the fact that he consulted others refutes Plaintiffs' argument that this shows Defendant Ruperto's recommendation was based on "his own personal motives."

was some debate on the ability to use multi-dose system due to the lack of regulatory direction or proscription on it. *See id.* "Whereas there was no regulation prohibiting it, certain individuals were under the impression it was illegal or not appropriate – including Stephen Grogan, Angelo Ruperto and Martin McMahon." *Id.*

Thereafter, in January of 2010, OMIG made a determination that the violations of law and professional misconduct committed by Plaintiffs, as contained in the final Consent Order, warranted the penalty of exclusion from the Medicaid program pursuant to 18 N.Y.C.R.R. § 515.7(e). Although Plaintiffs admit that Defendant Sheehan was not involved in the decision to exclude Pharma-Care from the Medicaid provider program, they argue that the exclusion "occurred as a result of policies he created as the Medicaid Inspector General and by his subordinates who carried out those policies, including Ruperto." Dkt. No. 56-2 at ¶ 69.

Following OMIG's decision to exclude Plaintiffs from the Medicaid program, Defendant Ruperto discussed with Richard Van Orden, the head of the ARU, notifying the DOH about the impending exclusion. *See* Dkt. No. 47-1 at ¶¶ 72-73. According to OMIG policy enacted by Defendant Sheehan, OMIG was to notify DOH regarding impending exclusions. *See* Dkt. No. 56-2 at ¶ 73. This policy was implemented at the request of the DOH, as they articulated a desire to know in advance when a provider servicing customers may be removed from the Medicaid program. *See id.* at ¶ 74. Further, Defendant Ruperto was concerned about the impact an unanticipated lapse in pharmacy services could have on the residents at the Adult Care Facilities served by Plaintiffs. *See id.* at ¶ 75.[6]

---

[6] Plaintiffs object to this statement arguing, that "a genuine issue of fact exists on the reason why Ruperto recommended exclusion, namely whether his motivation was the dislike for Cutie and its medication distribution system." Dkt. No. 56-2 at ¶ 75. Nowhere in paragraph 75 of

(continued...)

In or around mid-January of 2010, Defendant Ruperto contacted Defendant McMahon to apprise him of OMIG's decision to exclude Plaintiffs from the Medicaid program. *See* Dkt. No. 56-2 at ¶ 81. According to Defendant Ruperto, he contacted Defendant McMahon in particular because he was DOH's director of housing and adult services, overseeing the ACFs for the region Plaintiffs serviced. *See* Dkt. No. 47-1 at ¶ 82. During this call, Defendant Ruperto informed Defendant McMahon about the exclusion, explained what a Medicaid exclusion was, and told him that OMIG intended the exclusion to take effect within five (5) days as per OMIG's normal operating process. *See* Dkt. No. 56-2 at ¶ 83. Defendant McMahon, however, requested additional time to allow the ACFs to make transitions to other providers. *See id.* at ¶ 85. Ultimately, OMIG granted Defendant McMahon's request to delay the exclusion from five days to thirty days. *See id.* at ¶ 86.

At some point after learning about Plaintiffs' Medicaid exclusion, Defendant McMahon decided that the ACFs serviced by Plaintiffs should be informed. *See id.* at ¶¶ 87-88. According to Defendant McMahon, Defendant Ruperto did not ask him to make the calls to the ACFs, but Defendant McMahon did inform him that he was going to do so. *See id.* at ¶ 89. Further, the evidence indicates that Defendant Ruperto asked Defendant McMahon not to divulge the reasons for the Medicaid exclusion. *See id.* Defendant Ruperto also assisted Defendant McMahon in identifying the ACFs serviced by Plaintiffs. *See id.* Following Defendant McMahon's decision to contact Plaintiffs' customers, on or about February 18, 2010, Defendant Ruperto contacted

---

[6](...continued)
Defendants' statement of material facts do they discuss Defendant Ruperto's possible motivation for recommending Plaintiffs' exclusion from the Medicaid program. Paragraph 75 pertains only to Defendant Ruperto's motivation for contacting the DOH after the decision to exclude Plaintiffs had already been decided.

Defendant McMahon by telephone to confirm the issuance of the formal exclusion letter from OMIG to Plaintiffs. *See id.* at ¶ 95. Defendant Ruperto also forwarded Defendant McMahon a copy of the exclusion letter. *See id.* at ¶ 96. Defendant Sheehan was not contacted by Defendant McMahon regarding this issue and Defendant Sheehan was never informed of Defendant Ruperto's conversations with Defendant McMahon. *See id.* at ¶¶ 99-100.

During one of their conversations, Defendant McMahon inquired as to what Plaintiffs did to warrant exclusion. *See id.* at ¶ 101. In response, Defendant Ruperto informed Defendant McMahon about his investigation into Plaintiffs, and that Plaintiffs had "taken back medications and stockpiling them or having them and re-dispensing some of those medications." *Id.* at ¶ 102; *see also* Dkt. No. 54-1 at 40.

As far back as July 18, 2007, Defendant McMahon had expressed his dislike of the "Medicine On Time" system due to the possibility of re-dispensing discontinued medications returned by customers. *See* Dkt. No. 56-2 at ¶ 104. In an email conversation with fellow DOH employees, Defendant McMahon discussed Plaintiffs' system as follows: "I don't like this. How do we know that Cutie is destroying discontinued meds that have been paid for and for which they have been storing. Couldn't they be putting these meds back into their supply to give to other customers????" *Id.* at ¶ 105.

In a letter dated February 18, 2010, Plaintiffs were notified of OMIG's decision to exclude them from the Medicaid program, to take effect thirty days from the notice date. *See id.* at ¶¶ 107-08. Additionally, the notice set forth the administrative appeal process available to Plaintiff. *See id.* at ¶ 109. Following receipt of the notice of exclusion, on or about February 18, 2010, Defendant McMahon instructed his staff to call Plaintiffs' customers to notify them about the impending exclusion. *See id.* at ¶ 110. Defendant McMahon did not personally make any of the

calls to Plaintiffs' customers. *See id.* at ¶ 111.

Upon receiving the notice of exclusion, Plaintiffs availed themselves of the administrative appeal process and simultaneously filed an Article 78 proceeding, in which they obtained a temporary restraining order enjoining their exclusion. *See id.* at ¶¶ 114-15. The pending exclusion, set to take effect as of March 21, 2010, was adjourned pending the administrative appeal. *See id.* at ¶ 116.

Subsequently, by letter dated April 29, 2010, OMIG granted in part Plaintiffs' appeal by reducing the penalty from an exclusion from Medicaid participation to a censure. *See id.* at ¶¶ 117-18.[7] Contemporaneous with OMIG's decision to reduce the exclusion to a censure, Defendant Ruperto contacted Defendant McMahon to apprise him of the modification of the sanction. *See id.* at ¶ 120.

Although the decision to exclude Plaintiffs from the Medicaid program was reduced to a censure, Plaintiffs claim that they were damaged by Defendants actions, including their decision to contact Plaintiffs' customers before they had the ability to appeal the initial decision. *See generally* Dkt. No. 22. In their first amended complaint, Plaintiffs allege violations of their Due Process and Equal Protection Rights, "Stigma Plus" defamation, and various state law claims sounding in common law defamation, slander, liable *per se*, tortuous interference with

---

[7] Plaintiffs have denied this statement. Plaintiffs assert that they "deny this statement as written as the letter dated April 29, 2010 merely states, 'The OMIG has determined to reduce the sanction of exclusion to a censure, retroactive to the date of the exclusion' and does not state it granted Plaintiffs' appeal, much less even mention it reviewed the appeal. Thus a material issue of fact exists as to whether OMIG decided to reduce the censure as a result of their appeal or whether it was done for some other reason." Dkt. No. 56-2 at ¶ 117. The Court is unsure how else one could describe the result indicated in this letter. The subject line reads "Cutie Pharma-Care, Inc. Appeal of Notice of Immediate Agency Action," and grants almost entirely the relief Plaintiffs were seeking through their appeal, *i.e.*, reversal of the decision to exclude them from the Medicaid program.

15

contracts/business relations, and *prima facie* tort. *See id.*

Currently before the Court are Defendants' motions for summary judgment. *See* Dkt. Nos. 47 & 49.

# III. DISCUSSION

## A. Summary judgment standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding

16

functions of the judicial process by substituting convenience for facts").

## B.     42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

## C.     Personal involvement

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y.

1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

Personal involvement in the alleged constitutional violation is a prerequisite to finding a supervisory official liable under section 1983.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quotations omitted).  A supervisory official is personally involved in the violation of a plaintiff's constitutional rights if he (1) directly participates in the infraction; (2) fails to remedy the wrong after learning of the violation; (3) creates, or allows to continue, an unconstitutional practice; (4) is grossly negligent in the management of subordinates who caused the violation; or (5) fails to act after receiving information indicating that constitutional violations were occurring. *See id.*; *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).[8]

---

[8] It is unclear whether all five *Colon* bases for supervisor liability remain available in light of the Supreme Court's decision in *Iqbal*, which rejected the notion that a supervisor can be held liable based on "mere knowledge of his subordinate's discriminatory purpose" and instead required a showing of discriminatory purpose by the supervisor himself.  *See Iqbal*, 129 S. Ct. at 1948-49.

*Iqbal's* effect has been debated in the district courts.  *See, e. g., McCarroll v. Fed. Bureau of Prisons*, No. 9:08-CV-1343, 2010 WL 4609379, *4 (N.D.N.Y. Sept. 30, 2010) (noting that "[s]everal district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories"); *Kleehammer v. Monroe County*, No. 09–CV–6177, 2010 WL 4053943, *8 (W.D.N.Y. Sept. 8, 2010) (implying that only the first and third *Colon* categories survived *Iqbal's* requirement of "active conduct" to impose supervisor liability); *D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (citing, but disagreeing with, several recent decisions that

(continued...)

### D.	Eleventh Amendment immunity

The Eleventh Amendment provides a state with sovereign immunity from suit.  *See Virginia Office for Protection and Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (citation omitted).  "[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State."  *Id.* at 1638 (citation omitted).  Generally, New York and its agencies enjoy sovereign immunity from suit in federal court under the Eleventh Amendment.  *See Woods v. Rondout Valley Central Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (holding that the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities) (citation omitted).

In 1908, the Supreme Court decided *Ex parte Young*, 209 U.S. 123 (1908), which established an exception to the Eleventh Amendment sovereign immunity protection afforded to the states.  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Verizon Md., Inc. v. Pub. Serv. Com'n. of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 117 S. Ct. 2028, 138 L. Ed.2d 438 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)).

"Under *Ex parte Young*, the state officer against whom a suit is brought 'must have some connection with the enforcement of the act' that is in continued violation of the law."  *In re Dairy Mart Convenience Stores, Inc. v. Nickel*, 411 F.3d 367, 372-73 (2d Cir. 2005) (quoting *Ex parte*

---

[8](...continued)
interpreted *Iqbal* as eliminating all but the first and third *Colon* categories).

*Young*, 209 U.S. at 157). "So long as there is such a connection, it is not necessary that the officer's enforcement duties be noted in the act." *In re Dairy Mart*, 411 F.3d at 373. Deciding whether or not a state official has violated federal law, however, "affects both the initial immunity inquiry as well as the ultimate decision on the merits." 17A James Wm. Moore *et al.*, *Moore's Federal Practice* § 123.40[3][a] (3d ed. 2004); *see also In re Dairy Mart*, 411 F.3d at 374.

Plaintiffs admit that Defendant McMahon is no longer in his position with DOH and has since retired. *See* Dkt. No. 57 at 23 n.3. As such, Plaintiffs withdraw their claims against him in his official capacity. *See id.*

Similarly, although not addressed by the parties, Defendant Sheehan is no longer the Medicaid Inspector General and no longer works for the OMIG. *See* Dkt. No. 47-4 at ¶ 1. Defendant Sheehan's retirement does not moot Plaintiffs' claims for injunctive relief, however, because pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, a public "officer's successor is automatically substituted as a party" when an "officer who is a party in an official capacity . . . ceases to hold office while the action is pending." Fed. R. Civ. P. 25(d). Accordingly, Defendant James Cox, as the current Medicaid Inspector General, has been added as a defendant in this matter in his official capacity only.

Based on the foregoing, Plaintiffs' claims against Defendants McMahon and Sheehan in their official capacities are dismissed.

## E.      Equal protection claims

The Equal Protection Clause requires the government to treat all similarly situated people alike. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)).

A plaintiff may proceed under the Equal Protection Clause as either a "class of one," *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*) (citations omitted), or under the theory of "selective enforcement," *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (citation omitted).

### 1. Class of one

To prevail on a "class of one" equal protection theory, a plaintiff must show that the defendant "intentionally treated [him] differently from others similarly situated and that there is no rational basis for the difference in treatment." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds*, *Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000)).[9] The plaintiff's burden on a "class of one" claim is "extremely high," and a plaintiff cannot prevail absent a *prima facie* showing that he is "identical in all relevant respects" to the individuals with whom he compares himself. *Id.* (citation omitted). Specifically, the plaintiff must establish that

> "(i) no rational person could regard the circumstances of the
> plaintiff to differ from those of a comparator to a degree that would
> justify the differential treatment on the basis of a legitimate
> government policy; and (ii) the similarity in circumstances and

---

[9] The Court notes that *Neilson* involved the application of the class-of-one equal protection theory in the public employment context. Subsequent to the decision in *Neilson*, however, the Supreme Court explicitly held that "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 595 (2008). Thus, the Second Circuit "overrule[d] [*Neilson*] . . . to the extent that it conflicts with the holding of *Engquist*." *Appel v. Spiridon*, 531 F.3d 138, 139-40 (2d Cir. 2008). Nevertheless, the Second Circuit's discussion in *Neilson* regarding the level of similarity necessary to support a class-of-one equal protection claim has not been overruled. *See Smith v. Fischer*, No. 9:07-CV-1264, 2009 WL 632890, *10 n.30 (N.D.N.Y. Feb. 02, 2009) (quotation and other citations omitted).

difference in treatment are sufficient to exclude the possibility that
the defendants acted on the basis of a mistake."

*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quotation and

footnote omitted).[10]

In *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008), the Supreme Court eliminated

class-of-one claims for government employees. *Engquist* involved a former state employee who

sued his employer after being laid off during an agency reorganization, alleging that she was fired

for arbitrary and malicious reasons. *See id.* at 595. The Court analyzed *Olech* and noted that,

there, the plaintiff stated a valid class-of-one equal protection claim because she had "'been

intentionally treated differently from others similarly situated and that there is no rational basis

for the difference in treatment.'" *Id.* at 601 (quotation omitted). The Court continued, however,

that

> [t]here was no indication in *Olech* that the zoning board was
> exercising discretionary authority based on subjective,
> individualized determinations – at least not with regard to easement
> length, however typical such determinations may be as a general
> zoning matter. Rather, the complaint alleged that the board
> consistently required only a 15-foot easement, but subjected Olech
> to a 33-foot easement. This differential raised a concern of
> arbitrary classification, and we therefore required the State provide
> a rational basis for it.

---

[10] Although the Supreme Court used the words "similarly situated" to describe the standard
for a "class of one" claim, it is not the same standard of "similarity" as used in a protected-class
discrimination claim. *Neilson*, 409 F.3d at 104-05. The difference comes from the purpose of the
showing. *See id.* In a claim of discrimination based on group status, the treatment of persons in
similar circumstances is offered to "provide, along with other evidence, an evidentiary inference
of the use of particular impermissible factors," whereas in a "class of one" claim, "the existence of
persons in similar circumstances who received more favorable treatment than the plaintiff is
offered to provide an inference that the plaintiff was intentionally singled out for reasons that so
lack any reasonable nexus with a legitimate governmental policy that an improper purpose –
whether personal or otherwise – is all but certain." *Id.* (citation omitted).

*Id.* at 602-03 (citation omitted). Conversely, the *Engquist* Court found that some types of state action inherently "involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 603. Such state action does not violate the Equal Protection Clause "when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.* The Court found that "[t]his principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized" and dismissed the plaintiff's claim. *Id.* at 604. The Court noted, however, that its holding was limited to finding "that the class-of-one theory of equal protection has no application in the public employment context – and that is all we decide[.]" *Id.* at 607.

In *Analytical Diagnostic Labs, Inc.*, the Second Circuit discussed whether *Engquist* is limited to the public employment context or whether it should extend to other types of discretionary government behavior. *See Analytical Diagnostic Labs, Inc.*, 626 F.3d at 141-42. Joining the Seventh Circuit, the Second Circuit held that "not all discretionary activity is 'off-limits from class-of-one claims.'" *Id.* at 142 (quotation omitted). Quoting *Engquist*, the court held that there was a "'crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operations.'" *Id.* (quoting *Engquist*, 553 U.S. at 598, 128 S. Ct. 2146). Moreover, the court noted that the "'government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large.'" *Id.* (quotation omitted). As such, the court held that, because the department of health did "not possess unfettered discretion in deciding whether to revoke, suspend or otherwise limit an existing license[,]" the plaintiffs had a way to distinguish themselves from other labs that the

23

department of health allegedly subjected to less scrutiny.  *Id.* (citation omitted); *see also Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009) (noting that "the officer who repeatedly arrests someone solely because of malice does have a way to distinguish between the citizen repeatedly arrested and the citizen left alone: the officer hates the arrestee").

First, contrary to Defendants' allegations, the Second Circuit has made clear that not all discretionary governmental action is beyond the purview of a class-of-one equal protection claim. *See Analytical Diagnostic Labs, Inc.*, 626 F.3d at 141-42.  In *Analytical Diagnostic Labs, Inc.*, which involved a claim remarkably similar to the present matter, the Court permitted the plaintiffs' claim to proceed because they had a way to distinguish themselves from other labs that the department of health subjected to less scrutiny.  In the present matter, although Plaintiffs sufficiently distinguished themselves to survive Defendants' motion to dismiss, they have nevertheless failed to meet their burden on the class of one equal protection claim.

Plaintiffs argue that the similarly situated element is well established in the record.  *See* Dkt. No. 57 at 28.  Specifically, Plaintiffs contend that the evidence demonstrates that: "1) OMIG prior to Plaintiffs *never* excluded a pharmacy that received a censure and reprimand from SED . . . ; 2) OMIG *never* contacted DOH concerning the exclusion of any other pharmacy prior to Plaintiffs; and 3) OMIG/DOH had *never* contacted any pharmacy's customers prior to an exclusion taking effect."  *Id.* (citing Dkt. No. 56-1 at ¶¶ 32, 50, 52-57; Dkt. No. 55 at Exhibit "A") (emphasis in original).  Further, Plaintiffs contend that they have established that no other pharmacy's customers were told that the pharmacy would be subject to expulsion from Medicaid due to illegal conduct and that they had to switch pharmacies.  *See id.* at 29.

Plaintiffs also argue that, "[t]o further demonstrate the comparative class with regard to the exclusion itself, Plaintiffs previously produced a list of pharmacies in New York State that

had entered into consent orders with the SED around the time they did with their Amended Complaint, which was derived from their expert Brian W. Devane, Esq. in their prior Article 78 action." *Id.* Plaintiffs contend that, "[i]n its decision on the Motion to Dismiss, this Court held that Plaintiffs' attachment of this 'non-exclusive list of pharmacies/pharmacists "who were censured/entered into consent orders during the same time period as Plaintiffs and who were not excluded by OMIG" . . . cure[d] any defect in their class-of-one equal protection claim.'" *Id.* Additionally, Plaintiffs argue that "[t]he difference in treatment of Cutie is further demonstrable when one examines the contents of the affidavit submitted by Mr. Devane as it demonstrates that Omnicare (Cutie's chief competitor) paid $102 million dollars for fraud charges with SED, but was not excluded by OMIG, and correspondingly no contact of its customers occurred for grossly improper billing practices." *Id.* (citations omitted).

First, Omnicare did not pay New York SED $102 million dollars. That payment was made in 2006 "to settle Medicaid fraud cases in 43 states[.]" Dkt. No. 54-3 at 4, 35-36. The case was brought by Michigan Attorney General Mike Cox and Michigan's share of the settlement was $52.5 million. *See id.* at 35-36. As part of that settlement, Omnicare "never admitted any wrongdoing[.]" *Id.* at 36. As to the New York pharmacies owned by Omnicare, they were alleged to have "improperly billed Medicaid between 1997 and 2003." *Id.* at 25. The case was brought by then Attorney General Spitzer and the Attorney General's Medicaid Fraud Control Unit. *See id.* The audits into the pharmacies revealed a "wide variety of billing irregularities, including instances where the pharmacies had billed, in violation of the Medicaid regulations, filled prescriptions that lacked the signature of the prescribing physician; refilled telephone orders unsupported by written orders; dispensed drugs in strengths that differed from the written orders; dispensed drugs in quantities in excess of the quantity listed on the prescriptions; and dispensed

drugs without any written order." *Id.*

Significantly, the Office of the Medicaid Inspector General was not created until 2006 and Defendant Sheehan, the first Medicaid Inspector General, was not appointed to the position until April of 2007. *See* Gale Scott, *State's top Medicaid-fraud cop asked to resign*, Crain's New York, June 17, 2011, http://www.crainsnewyork.com/article/20110617/FREE/110619878/states-top-medicaid-fraud-cop-asked-to-resign (last visited September 19, 2014). Moreover, it is well known that the Office of the Medicaid Inspector General was created to curb "billions of dollars in fraud and misspending by health care providers." Nina Bernstein, *Under Pressure, New York Moves to Soften Tough Medicaid Audits*, N.Y. Times, Mar. 8, 2012, http://www.nytimes.com/ 2012/03/19/nyregion/new- medicaid-inspector-general-supports-less-adversarial-audits. html? pagewanted=all&_r=0; *see also* Dkt. No. 47-4 at ¶¶ 2-5. The fact that the Office of Medicaid Inspector General was not in existence at the time Omnicare settled the cases brought against it renders that situation considerably different from the situation involving Plaintiffs. As such, Plaintiffs cannot be said to be "identical in all relevant respects" with Omnicare.

Additionally, Plaintiffs' amended complaint contains a "non-exclusive list of pharmacies/pharmacists 'who were censured/entered into consent orders during the same time period as Plaintiffs and who were not excluded from [Medicaid]." Dkt. No. 22. at ¶ 40; Dkt. No. 22-2. Despite claims to the contrary, many of the entities on the list were actually excluded by OMIG after receiving censure/entering into consent orders with SED. *See* Dkt. No. 22-2. Attached to the declaration of Defendant Ruperto is a more complete list, illustrating the entities who were ultimately excluded by OMIG after censure/consent orders with SED and those who were not. *See* Dkt. No. 47-11. Significantly, Pharma-Care is a closed-door pharmacy, catering primarily to ACFs. In the list submitted, Plaintiffs have not identified another similar entity.

Rather, the list appears to contain primarily retail pharmacies and pharmacists. Again, this refutes Plaintiffs' assertion that they have identified comparators that were identical in all relevant respects.

Plaintiffs also argue that the record shows: "1) OMIG . . . *never* excluded a pharmacy that received a censure and reprimand from SED prior to Plaintiffs; 2) OMIG *never* contacted DOH concerning the exclusion of any other pharmacy prior to Plaintiffs; and 3) OMIG/DOH had *never* contacted any pharmacy's customers prior to an exclusion taking effect." Dkt. No. 57 at 30-31 (emphasis in original). Again, however, Plaintiffs' arguments are misplaced. Even if the evidence did support Plaintiffs' assertions, the fact remains that they have failed to present a sufficiently similar comparator. If a retail pharmacy is excluded from participating in Medicaid, its customers can simply get their prescriptions filled at any number of other retail pharmacies. Residents of ACFs, however, do not have a comparable option.

Although Plaintiffs take issue with Defendants' characterization of residents of ACFs as a "more vulnerable population than comparative able bodied individuals in light of their required need for assistance," the objection is entirely without merit. *See* Dkt. No. 56-2 at ¶ 16. According to the Social Services Law, an adult care facility is defined as follows:

> Adult care facility shall mean a family type home for adults, a shelter for adults, a residence for adults, an enriched housing program or an adult home, which provides temporary or long-term residential care and services to adults who, though not requiring continual medical or nursing care as provided by facilities licensed pursuant to article twenty-eight of the public health law or articles nineteen, twenty-three, thirty-one and thirty-two of the mental hygiene law, are by reason of physical or other limitations associated with age, physical or mental disabilities or other factors, unable or substantially unable to live independently.

N.Y. Soc. Serv. Law § 2(21). By its very definition, ACFs only provide services to those who are

more vulnerable than comparatively able-bodied individuals.

Moreover, pursuant to the Social Services Law, the DOH is tasked with the responsibility to "protect and assure the life, health, safety and comfort of adults . . . who must be cared for away from their own homes." N.Y. Soc. Serv. Law § 460. Defendant Ruperto's decision to contact Defendant McMahon regarding the decision to exclude Plaintiffs from Medicaid, and Defendant McMahon's decision to contact the ACFs with residents serviced by Plaintiffs falls within the prescribed responsibility of Defendants. In light of the differences between the services Plaintiffs provide and those of the alleged retail comparators, Plaintiffs have failed to establish that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Analytical Diagnostic Labs, Inc.*, 626 F.3d at 140 (quotation and footnote omitted).

Additionally, contrary to Plaintiffs' contentions, this was not the only time where OMIG personnel contacted DOH to give them advanced notice prior to a termination/exclusion taking effect out of a concern for Medicaid recipients. In or around 2008-2009, when Small Smiles Dentistry of Albany/Albany Access Dentistry, a children's dental practice in Albany, New York, was going to be terminated/excluded, OMIG contacted DOH Office of Health Insurance Programs personnel prior to the termination/exclusion to work with them to mitigate potential disruption of care and issues stemming from the termination/exclusion. *See* Dkt. No. 47-5 at ¶ 29. As such, Plaintiffs have failed to establish that Defendants' conduct constituted disparate treatment.

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiffs' class of one equal protection claim.

### 2. Selective enforcement

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'" *Diesel*, 232 F.3d at 103 (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). Nevertheless, it is well settled that a plaintiff must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (quotation omitted). "[T]o succeed on a 'selective enforcement claim,' a plaintiff must show: '(1) that they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 WL 2782527, *26 (D. Conn. Sept. 21, 2007) (quotation omitted); *see also Cine SK8*, 507 F.3d at 790 (quotation omitted); *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) (holding that "[a] selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated"). In particular, a "plaintiff must present evidence comparing [him]self to individuals that are 'similarly situated in all material respects.'" *Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 WL 2782527, *26 (D. Conn. Sept. 21, 2007) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

For all the reasons discussed above, Plaintiffs have failed to present evidence comparing themselves to others that are similarly situated in all material respects. Further, Defendants have presented evidence that similar actions were taken with another provider prior to the providers exclusion/termination from the Medicaid program. *See* Dkt. No. 47-5 at ¶ 29. Additionally, the

Court finds that Plaintiffs have failed to demonstrate that the different treatment was based on impermissible considerations. The only evidence Plaintiffs have presented regarding impermissible considerations is that Defendants had on several occasions discussed whether Plaintiffs' prescription dispensing mechanism called the Medicine-on-Time system was permissible under the relevant regulations. None of the cited conversations provide any support for Plaintiffs' arguments that Defendants' actions were undertaken with a malicious or bad faith intent to injure.

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiffs' selective enforcement claims.

## F.      Due Process claims

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"  U.S. CONST. amend. XIV.  The Due Process Clause contains both a procedural and substantive component.  *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  The procedural component bars the deprivation of a constitutionally protected interest in life, liberty or property without due process of law, while the substantive component bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures to implement them.  *See id.* (quotation omitted).

### 1. Substantive due process

To state a substantive due process claim, a plaintiff must demonstrate that (1) he had a "valid 'property interest' in a benefit that was entitled to constitutional protection," (2) he was

denied that interest, and (3) that the defendants' actions in depriving him of that interest were "so outrageously arbitrary as to be a gross abuse of governmental authority." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 17 (2d Cir. 1999) (internal quotation marks omitted); *see also Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir. 2006) (holding that the plaintiff must establish that the government misconduct was "arbitrary," "conscience-shocking," or "oppressive in the constitutional sense," and not merely "incorrect or ill-advised") (internal quotation marks omitted).

In the present matter, the property interest that Plaintiffs have identified is a loss of Medicaid billings due to their loss of customers following DOH's calls notifying Plaintiffs' customers of the pending exclusion from Medicaid. *See* Dkt. No. 22 at ¶ 58. Significantly, however, the Second Circuit has found that a Medicaid provider has "no property right to continued enrollment as a qualified provider." *Senape v. Constantino*, 936 F.3d 687, 691 (2d Cir. 1991).

Even if Plaintiffs did have a valid property interest, the Court finds that Plaintiffs have failed to establish that Defendants' actions were arbitrary, conscience shocking or oppressive in the constitutional sense. As discussed, Defendants had taken similar actions regarding another provider during that time period. OMIG's policy of contacting DOH prior to an exclusion taking place was put in place at the DOH's request. This policy and Defendant McMahon's decision to contact Plaintiffs' customers prior to the exclusion taking effect were to ensure the continuity of services for a potentially vulnerable class of individuals that the DOH is statutorily tasked with safeguarding. Nothing in the record supports Plaintiffs' claims that this conduct was conscience shocking or oppressive in the constitutional sense. *See Ferran*, 471 F.3d at 369-70 (quotation omitted). Rather, Defendants' actions were taken in light of Plaintiffs' professed guilt to various

acts of professional misconduct.

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiffs' substantive due process claims.

### 2. Procedural due process

In order to prevail on a Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983, "the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001)). "Property rights arise from '"an independent source such as state law," [with] federal constitutional law determin[ing] whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.'" *Pichen v. City of Auburn, N.Y.*, 728 F. Supp. 2d 192, 198 (N.D.N.Y. 2010) (quotation and other citation omitted). The essential principle of procedural due process is that a deprivation of life, liberty or property should be preceded by notice and an opportunity for a hearing appropriate to the nature of the case. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted). However, "[w]here there is a meaningful postdeprivation remedy, there is no due process violation." *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998).

In the present matter, the Court finds that Plaintiffs were provided with adequate due process. Plaintiffs were notified of the administrative appeal process upon being alerted of their pending exclusion and Plaintiffs successfully availed themselves of that process, resulting in a censure rather than exclusion. Moreover, Plaintiffs were entitled to and utilized the process afforded by a CPLR Article 78 proceeding. As part of the Article 78 proceeding, the state court

granted Plaintiffs' application for temporary injunctive relief, thereby preventing Plaintiffs from being excluded from the Medicaid program pending the conclusion of their administrative appeal. Accordingly, the Court finds that Plaintiffs were provided with adequate due process. *See Jones v. U.S. Dept. of Housing and Urban Development*, No. 11 CV 0846, 2012 WL 1940845, *5 (E.D.N.Y. May 29, 2012) (citation omitted); *Grant v. Donovan*, No. 12-CV-4555, 2013 WL 4516781, *2 (E.D.N.Y. Aug. 23, 2013).

To the extent that Plaintiffs are claiming that Defendants' actions and policies resulted in the "unjust taking of Plaintiffs' business goodwill," the claim is similarly unavailing. Plaintiffs contend that Defendant "Ruperto's action of contacting DOH for an immediate exclusion of Cutie within five (5) days and participating in telephone calls with McMahon concerning the creation of a plan to unilaterally contact Plaintiffs' customers, when neither had ever taken such an action in the past, is, by definition, 'arbitrary' governmental action, especially given the minor violations set forth in the Consent Order." Dkt. No. 57 at 37. After Plaintiffs successfully appealed their Medicaid exclusion, DOH later made calls to the customers apprising them that the exclusion had been overturned.[11] As such, Plaintiffs were provided with a "name clearing hearing" – the only post deprivation remedy to which they may have been entitled. *See Zinermon v. Burch*, 494 U.S. 113, 115 (1990).

Alternatively, the Court finds Defendants have established that affording pre-deprivation process would have been otherwise impractical and potentially allowed the exclusion to go into

---

[11] Although Plaintiffs argue that there is a question of fact regarding whether Defendant McMahon ever ordered that the ACFs be contacted to inform them that the exclusion had been overturned, the citations they provide do not support their contention. The portion of Patricia Hasan's deposition to which Plaintiffs' cite discusses the initial telephone calls made. *See* Dkt. No. 54-2 at 119-120.

effect before they could contact the impacted ACFs.  Moreover, Defendant McMahon's

discretionary decision to contact the ACFs was not arbitrary or an abuse of discretion.  *See*

*Cantazaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999) ("The law should not discourage officials

from taking prompt action to insure the public safety.  By subjecting a decision to invoke an

emergency procedure to an exacting hindsight analysis, where every mistake, even if made in

good faith, becomes a constitutional violation, we encourage delay and thereby potentially

increase the public's exposure to dangerous conditions.  This quandary is exactly what these

emergency procedures are designed to prevent, and is the primary reason they are constitutionally

acceptable"); *see also Matter of Fahey v. Perales*, 141 A.D.2d 934, 936 (3d Dept. 1988) (holding

that "the claim that petitioner was denied the due process of a 'pre-deprivation hearing' is

unavailing as it is well established that the Commissioner of Health need not hold a hearing

before acting to recoup Medicaid payments").

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to

Plaintiffs' procedural due process claims.


**G.      Deprivation of liberty interest without due process**

A "stigma-plus" due process claim requires a plaintiff to establish "(1) the utterance of a

statement about her that is injurious to her reputation, 'that is capable of being proved false, and

that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in

addition to the stigmatizing statement.'"  *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (quoting

*Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds*,

*Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003)).

"The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a

statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Id.* (citing *Donato v. Plainview–Old Bethpage Cent. School Dist.*, 96 F.3d 623, 631–32 (2d Cir. 1996)). "Similarly, because '[a] free-standing defamatory statement . . . is not a constitutional deprivation,' but is instead 'properly viewed as a state tort of defamation,' . . . the 'plus' imposed by the defendant must be a specific and adverse action clearly restricting the plaintiff's liberty — for example, the loss of employment, . . . or the 'termination or alteration of some other legal right or status.'" *Id.* (internal citations and other quotations omitted).

In the present matter, the Court finds that Plaintiffs have failed to establish a stigma-plus due process claim. Although Plaintiffs make conclusory assertions to the contrary, Defendant McMahon instructed his employees to not inform any of Plaintiffs' ACF customers the reason for Plaintiffs exclusion from the Medicaid program. As such, Defendant McMahon's employees simply instructed Plaintiffs' customers that Plaintiffs were being excluded from Medicaid as of March 21, 2010. At the time the statement was made, Plaintiffs had not yet succeeded on their appeal of OMIG's decision; and, therefore, the statement accurately conveyed that Plaintiffs were to be excluded as of March 21, 2010.

Moreover, even assuming Plaintiffs' version of the statements that Defendant Ruperto made to Defendant McMahon, the record demonstrates that the statements were truthful. Defendant McMahon testified that Defendant Ruperto told him that Plaintiffs were to be excluded by decision of OMIG, explained to him what the concept of exclusion meant, and told him that SED had conducted an investigation of Plaintiffs and in the course of their investigation found that Plaintiffs had "taken back medications and stockpiling them or having them and re-dispensing some of those medications." Dkt. No. 54-1 at 40. All of those claims are fundamentally true. As set forth in the SED Final Investigation Report, SED had conducted an

investigation of Plaintiffs and concluded, among other things, that they had taken back drugs, maintained them in their stocks and re-dispensed them. *See* Dkt. No. 47-13. In fact, Pharma-Care's own pharmacist, Wayne Thygesen, admitted to SED investigators that the pharmacy was re-dispensing medications. *See* Dkt. No. 47-14 at 1-2, 3-5.

Based on the foregoing, the Court grants Defendants' motions for summary judgment as to Plaintiffs' stigma-plus due process claim.


**H.     Qualified immunity**

"The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent*."

*Mollica v. Volker*, 229 F.3d 366, 370-71 (2d Cir. 2000) (quoting *Anderson v. Creiehton*, 483 U.S. 635, 640 (1987)) (emphasis in original). "Where the right at issue in the circumstances confronting police officers . . . was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if . . . it was objectively reasonable for them to believe their acts did not violate those rights.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir.

36

2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York*, 612, F.3d 149, 165 (2d Cir. 2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness. . . . That is, '[e]ven if the right at issue was clearly established in certain respects . . . an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.'" *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner*, 494 F.3d at 367 (citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that . . . it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case."'" *Id.* (quotation and other citations omitted).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman*, 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make

the ultimate legal determination of whether qualified immunity attaches on those facts."

*Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

In the present matter, the Court finds that all Defendants are, alternatively, entitled to qualified immunity as their alleged actions were wholly lawful and objectively reasonable. OMIG had a statutorily recognized right to undertake immediate action of its own, including the imposition of sanctions and/or exclusion of Plaintiffs, upon finding that Plaintiffs had admitted to various acts of professional misconduct. *See* 18 N.Y.C.R.R. § 515.7(e). In relevant part, the controlling regulation provides as follows:

> Upon receiving notice that a person has been found to have violated a State or Federal statute or regulation pursuant to a final decision or determination of an agency having the power to conduct the proceeding and after an adjudicatory proceeding has been conducted, in which no appeal is pending, or after resolution of the proceeding by stipulation or agreement, and where the violation resulting in the final decision or determination would constitute an act described as professional misconduct or unprofessional conduct by the rules or regulations of the State Commissioner of Education or the State Board of Regents, or an unacceptable practice under this Part, or a violation of article 33 of the Public Health Law, the department may immediately sanction the person and any affiliate.

*Id.* Plaintiffs admitted to engaging in professional misconduct in the Final Consent Order, which was the final determination of the agency, and no appeal was pending.

As to Defendant McMahon, the Court finds the case cited by defense counsel instructive. *See* Dkt. No. 49-5 at 23. In *DiBlasio v. Novello*, 413 Fed. Appx. 352 (2d Cir. 2011), the plaintiff was a radiologist who brought suit against the DOH alleging due process claims associated with the summary suspension of his medical license. *See id.* at 355-56. The defendant received an OPMC investigation report that concluded that the plaintiff had engaged in flawed breast cancer

screening practices, which resulted in an abnormally low rate of breast cancer detection.  *See id.*

The defendant announced an immediate suspension of the plaintiff and, in doing so, included the

basis for the decision to suspend him, including statements which concerned the plaintiff's

professional reputation and allegedly impeded his ability to practice.  *See id.*  Granting the

defendant's motion, the Second Circuit found that the defendant was entitled to qualified

immunity with respect to her public statements announcing and explaining the basis for the

plaintiff's suspension.  *See id.*  The court found that the defendant reasonably relied on the OPMC

investigation report that was before her at the time she made the statements.  *See id.*  The court

held that given the lack of clearly established law relating to the boundaries of an official's

permissible public comment in the context of a public health emergency, and the fact that the

statements were not wholly irrelevant, gratuitous, or otherwise far beyond the scope of

emergency, immunity applied.  *See id.* at 356.

   In the present matter, Defendant McMahon was presented with a factually similar

situation with one significant distinction, Defendant McMahon did not communicate the basis of

Plaintiffs' exclusion to the ACFs.  Moreover, Defendant McMahon believed that he was required

to make the calls to the ACFs notifying them of the exclusion so that they could prepare for its

consequences on their residents.  Defendant McMahon's office was responsible for protecting the

life, health and safety of facility residents.  *See* N.Y. Soc. Services Law § 460.  Defendant

McMahon reasonably relied on the information provided by Defendant Ruperto and the SED

Final Investigation Report.  At best, Defendant McMahon's decision to contact the ACFs prior to

Plaintiffs being afforded the opportunity to appeal the decision was a mistake in judgment, which

could have been made by individuals in his position of reasonable competence.  *See Robinson v.*

*Jimminez*, No. 08-CV-902, 2012 WL 1038917, *7 (E.D.N.Y. Mar. 6, 2012) (holding that even if

the defendant showed "poor judgment" as the plaintiff alleged, "qualified immunity protects government officials when they make 'reasonable mistakes' about the legality of their actions, . . . and is 'applied regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact'") (quoting *Saucier*, 533 U.S. at 206; *Pearson*, 555 U.S. at 231); *see also Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (noting that "the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law'").

Finally, regarding Defendant Sheehan, the policy he enacted regarding informing the DOH whenever a Medicaid provider was about to be excluded from the program was objectively reasonable. The policy was put in place at the DOH's insistence and served to assist the DOH in carrying out its statutory responsibilities.

Based on the foregoing, the Court finds that, in the alternative, Defendants are entitled to summary judgment as to all of Plaintiffs' federal claims.


I.     **Plaintiffs' state law claims**

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted). The Second Circuit has held that "'if [all] federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" *Castellano v. Bd. of Trustees*, 937 F.2d 752, 758 (2d Cir. 1991) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n.7 (1988) (enumerating several factors that courts should weigh in considering

whether to exercise supplemental jurisdiction – "the values of judicial economy, convenience, fairness, and comity" – and suggesting that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims").

Since the Court has dismissed all of Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over their state-law claims and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).


## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions for summary judgment are **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 25, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge